320 So.2d 436 (1975)
MERRILL LYNCH, PIERCE, FENNER & SMITH, and Arthur Pritchard, Appellants
v.
Herman T. BYRNE, Appellee.
No. 74-1370.
District Court of Appeal of Florida, Third District.
September 23, 1975.
Rehearing Denied November 3, 1975.
*437 Smathers & Thompson and Mercer K. Clarke, Miami, for appellants.
Pettigrew & Bailey, Miami, for appellee.
Before BARKDULL, C.J., and PEARSON, J., and DREW, E. HARRIS (Ret.), Associate Judge.
DREW, E. HARRIS (Retired), Associate Judge.
This appeal is governed by the stipulation entered into between the parties, which greatly simplifies the issues and substantially reduces the necessity for an extensive review of a large record. Counsel is to be commended for using the provisions of the rules in this regard.[1]
While we ordinarily do not copy exhibits extensively in our decisions, we deem it appropriate and useful here to set forth this stipulation  and the decree of the trial court from which this appeal is prosecuted.
The Stipulated Statement:
"1. On July 6, 1972, Herman T. Byrne, who had an account with Merrill Lynch, requested that Arthur Pritchard buy for Byrne's account 1,000 shares of Curtiss Wright stock `at market with a stop loss at 54.' A stop loss order is an order automatically to sell stock whenever its market price decreases to the designated price. Pritchard did not comply with Byrne's order. Instead he placed a buy order without a `stop loss,' resulting in a purchase for Byrne's account of 500 shares of Curtiss Wright at 57 3/8 and 500 shares at 57 1/2. Pritchard then entered the stop order, and went to lunch. When he returned from lunch Pritchard learned that the buy order had been effected but that the later stop order had been rejected. This was because the New York Stock Exchange was not accepting stop orders on Curtiss *438 Wright stock due to its volatility. At the time Byrne had placed the order with him, Pritchard had at his immediate disposal a computer printout listing those stocks for which the Exchange was not adcepting stop loss orders, and Curtiss Wright was listed on it. Pritchard did not check the computer printout and erroneously advised Byrne that a stop order in Curtiss Wright could be placed at 54.
2. This Court has previously rendered a summary judgment for Byrne on the facts set forth in paragraph 2, this is, on plaintiff's case-in-chief, leaving only the applicability, in law and fact, of Defendants' affirmative defenses to be decided.
3. Curtiss Wright stock decreased in market price below 54 on July 7, 1972, and remained below 54 until the latter part of August of 1972. During this period of time, Merrill Lynch personnel periodically advised Byrne of the changes in market price of Curtiss Wright stock. On August 31, and September 1, 1972, Paul Marsal, the branch manager of the Merrill Lynch office at which Byrne had placed his initial order, advised Byrne of the market price at or near the closing of the market on each day. Among others, the quotes given to Byrne were as follows:

 August 30, 1972 54 3/4
 August 31, 1972 54 3/4
 September 1, 1972 54

4. If called to be a witness, Marsal would testify as follows: (a) Marsal also said to Byrne on each of these days that the market in Curtiss Wright stock was orderly, that there had been no halts in trading and that if he wished to sell his Curtiss Wright stock at the market, it easily could be done; (b) on one such occasion Byrne advised Marsal that he was not interested in selling at that time and wished to hold onto the Curtiss Wright stock; (c) in a subsequent telephone conversation, Byrne advised Marsal that he, Byrne, would have to consult with his attorney as to what course of action to take.
Although Plaintiff concedes that Marsal would so testify, Plaintiff does not agree that such testimony and facts are material, relevant or admissible.
5. If called to be a witness, Bennett Falk of the Law Department of Merrill Lynch would testify that: (a) he wrote the letter attached hereto as Exhibit 1 to Byrne's attorney confirming a prior conversation with Byrne's attorney to the effect that, in Falk's view, Merrill Lynch's liability, if any, would be fixed by the highest price of Curtiss Wright Stock on the rebound. Plaintiff agrees that this letter was receive by Byrne's attorney soon after it was mailed, but does not agree that such testimony and evidence is material, relevant or admissible.
6. On August 31, 1972, Byrne's attorney wrote the letter attached hereto as Exhibit 2 to Paul Marsal advising him to cease further personal communications with Byrne. This letter was received by Mr. Marsal. Plaintiff does not agree that such evidence is material, relevant or admissible.
7. If called to be a witness, Falk would also testify that on September 1, 1972, he wrote the letter attached hereto as Exhibit 3 to Byrne's attorneys advising Byrne's attorney of Falk's view that, in substance, as of that date Curtiss Wright had reached a level in excess *439 of $54.00 per share and that Byrne's decision to hold the stock rather than sell it would be from that point forward at his own risk. Byrne's attorney received this letter. Plaintiff does not agree that this evidence is material, relevant or admissible.
8. On August 30, August 31 and September 2, 1972, Curtiss Wright stock closed at 54 or above and on the next trading day, September 5, 1972, it reached its (post-July 6, 1972 and prior to this suit) high of 55 3/8. Byrne knew on these days that the stock had reached such levels and could have sold his Curtiss Wright stock at such levels, less commissions, on such days, but did not do so.
9. On January 9, 1973, Byrne wrote the letter attached hereto as Exhibit 4, to the branch manager of the Merrill Lynch office of which he had placed his initial order advising Merrill Lynch that he intended to assert a claim for rescission under the Florida Sales and Securities Statute. Defendants declined, and this lawsuit ensued.
10. The question of attorneys' fees and interest may be decided by the Court following resolution of the applicability, in law or fact, of Defendants' affirmative defenses."
The Final Decree:
"1. Defendants' failure to advise the Plaintiff that a stop order could not be entered on the Curtiss-Wright stock constituted an omission to state a material fact in violation of Fla. Stat. § 517.301.
2. The Court finds that the defenses of estoppel, waiver and ratification are proper legal defenses to a violation of Fla. Stat. § 517.301 and the remedies set forth in Fla. Stat. § 517.21, but finds that Defendants would have had to have offered to re-purchase the subject stock from the Plaintiff at the Plaintiff's original purchase price in order to prevail on any or all of these affirmative defenses.
3. Defendants, Merrill Lynch, Pierce, Fenner & Smith, Inc., and Arthur Pritchard, have failed to make a showing by the greater weight of the credible evidence that they at any time offered to make Plaintiff whole.
4. The matter having been submitted to the Court by agreement of the parties on affidavits, and the Court being fully advised in the premises finds that a reasonable attorneys' fee pursuant to the statute, the work performed and the result obtained by Plaintiff's counsel in this case is $8,000.
It is, therefore,
Ordered and adjudged as follows:
A. Merrill Lynch, Pierce, Fenner & Smith, Inc., already having possession of the one thousand (1,000) shares of Curtiss-Wright common stock, is hereby declared to be owner of the said stock, and Plaintiff, Herman T. Byrne, is therefore entitled to have and recover of and from Defendants, Merrill Lynch, Pierce, Fenner & Smith, Inc., and Arthur Pritchard, jointly and severally, the entire purchase price paid by him on July 6, 1972, in the amount of Fifty-Seven Thousand Four Hundred Thirty-Seven and 50/100 Dollars ($57,437.50), together with interest at six percent (6%) per annum from that date totaling Six Thousand Eight Hundred Sixteen and 33/100 Dollars ($6,816.33), making a grand total of Sixty-Four Thousand Two Hundred Fifty-Three and 83/100 Dollars ($64,253.83).

*440 B. Plaintiff is further awarded 8000.00 _________________________ ($ ____) as attorneys' fees and Two Hundred Eighty-Two Dollars ($282.00) as costs.
C. Plaintiff is therefore entitled to have and recover of and from Defendants, Merrill Lynch, Pierce, Fenner & Smith, Inc., and Arthur Pritchard, jointly and severally, a total of ______________________ ($72,535.83), for which sum let execution issue forthwith."
We can eliminate from further discussion the question of whether this transaction falls within the orbit of Florida's Blue Sky Laws[2] in view of the provisions of the stipulation that it does. This being conceded it necessarily follows that all provisions of this Chapter[3] are applicable to the transaction. The portion of the Act relating to remedies available in the case of an unlawful sale is ¶ 517.21.[4]
Many challenging attacks are made by appellants on the judgment appealed from, among which is that scienter is necessary to establish the violation of ¶ 517.301. This question is foreclosed by the terms of the stipulation but, if it were present here, we cannot agree that it is material. Scienter may well be an essential element in statutes where fraud and deceit are made the essence of an action. It is particularly applicable, of course, in criminal statutes. In laws of the type involved here, we think the principal wholly inapplicable. Appellant concedes there are no Florida cases supporting his contention but says the Federal cases relating to identical statutes hold to the view he presents. We don't agree with the Federal decisions[5] he relies on. Moreover they are not at all conclusive on the point, and, of course, they are not binding on us. We think the better Federal decisions[6] and the clear weight of authority is that scienter is not necessary to recovery. The defense *441 of estoppel, so strongly argued, is not available here for the reasons stated by the trial judge and hereafter more fully discussed. These defenses  and related defenses were ably argued and presented in the briefs.
After due consideration of the points preserved by the assignments of error, we reach the conclusion that the answers to the questions presented for decision are found in the language of the Statute. This being so, it becomes not only unnecessary but unseeming to turn to other sources for guidance. The business of selling securities to the general public has long been recognized as an area subject to legislative regulation and control. The first significant legislation at the Federal level was in 1933. The States for many years prior to that had enacted many statutes all primarily designed to protect the "naive and unsophisticated investor" against unscrupulous dealers. Such statutes are now universally in effect, both State and Federal.[7] These are paternalistic laws enacted by the States under the police power and are the type of laws that are entitled to vigilant enforcement by the courts, where, as here, they are unambiguous and meet constitutional requirements.
The main thrust of appellants' argument  and the portion that at first blush appeared palatable to us  was that, although the statute was clearly applicable to the transaction, when it was discovered that the stop order was inapplicable to Curtiss-Wright stocks, the later rise in the market value accompanied by the action of the broker in so advising the buyer and urging him to sell at a price above the point agreed in the original purchase, that the buyer caused the subsequent loss and was bound thereby  or at least such loss should be no more than the difference between the later price above the stop order price and the cost to the buyer.[8] On further consideration, however, we think this argument is untenable here because the statute clearly and unmistakably places the burden on the broker to "offer in writing" to take back the securities and refund the purchase price in full together with interest to be computed as provided in detail in the statute. The broker, therefore, is able to limit its loss in most cases by prompt action so the argument that the broker should not have to bear the loss here when the buyer  by selling at the higher price  could have prevented it, is without substance. Moreover, we feel that the statute is clearly designed for the benefit of the buyer  not the broker who is presumed to have superior knowledge and is in a position to minimize his losses. The statute also gives the buyer two years to bring an action where such offer to repurchase is not made. It must be assumed the Legislature knew that in a two-year period the loss to the broker could be substantial and placed the limitation there to enforce the sanctions imposed and to compel immediate attention to buyers who do not get what they thought they bought.
And so, if we literally apply the statute  which we must  the simple answer is that the broker should have immediately told the buyer he could have his money back and offered it "in writing" to him. This was not done. The buyer is guilty of nothing. He is protected by the statute. He has a right to invoke its sanctions. He has done so within the time the statute prescribed and in the manner prescribed and the trial court was correct in requiring the broker to do what the statute says it should do and to add to the judgment the additional charges authorized.
Affirmed.
NOTES
[1] F.A.R. 3.6(h).
[2] Particularly ¶ 517.301 which provides "It is unlawful * * * (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; ..."
[3] Chapter 517 F.S.A.
[4] "517.21  (1) Every sale made in violation of any of the provisions of this chapter shall be voidable at the election of the purchaser; and the person making such sale and every director, officer or agent of or for the seller, if the director, officer or agent shall have personally participated or aided in any way in making the sale, shall be jointly and severally liable to the purchaser in an action at law in any court of competent jurisdiction upon tender of the securities sold or of the contract made, for the full amount paid by such purchaser, with interest, together with all taxable court costs and reasonable attorney's fees; provided, that no action shall be brought for the recovery of the purchase price after two years from the date of such sale and provided further, that no purchaser otherwise entitled shall claim or have the benefit of this section who shall have refused or failed within thirty days from the date thereof to accept an offer in writing of the seller to take back the security in question and to refund the full amount paid by such purchaser, together with interest on such amount for the period from the date of payment by such purchaser down to the date of repayment, such interest to be computed:

(a) In case such securities consist of interest bearing obligations at the same rate as provided in such obligations; and
(b) In case such securities consist of other than interest hearing obligations at the rate of six per cent per annum; less, in every case, the amount of any income from said securities that may have been received by such purchaser.
(2) Any person having a right of action against a dealer or salesman under this section shall have a right of action under the bond provided in § 517.12."
[5] In Moerman v. Zipco, Inc., 302 F. Supp. 439 (E.D.N.Y. 1969); Heit v. Weitzen, 402 F.2d 909, 913 (2nd Cir.1968); Gerstle v. Gamble-Skogmo, Inc., 298 F. Supp. 66, 97 (E.D.N.Y. 1969); City National Bank of Fort Smith, Arkansas v. Vanderboom, 422 F.2d 221 (8th Cir.1970).
[6] Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir.1972); Ellis v. Carter, 291 F.2d 270 (9th Cir.1961). (These decisions were candidly cited by appellant as being contrary to the view he urged.)
[7] See Securities Regulation Federal  69 Am. Jur.2nd pg. 591 et seq. Also see Security Regulation State, 69 Am.Jur.2nd pg. 1059 et seq.
[8] The broker says this position was the one taken by it in the correspondence by its attorney with the buyer's attorney. We agree that, while a close question, this is a conclusion that could be reached from that correspondence.