Arnold SILVERBERG, Plaintiff-Appellee,

v.

PAINE, WEBBER, JACKSON & CURTIS, INCORPORATED, a Delaware Corporation and Hubert T. Houston, individually, Defendants-Appellants.

No. 81–6082.

United States Court of Appeals, Eleventh Circuit.

July 25, 1983.

Delbridge L. Gibbs, Marks, Gray, Conroy & Gibbs, Nick V. Pulignano, Jr., Jacksonville, Fla., for defendants-appellants.

Charles P. Pillans, III, Bedell, Bedell, Dittmar & Zehmer, Peter D. Webster, Jacksonville, Fla., for plaintiff-appellee.

Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This case is an appeal from a jury verdict in the United States District Court for the Middle District of Florida. The jury returned a special verdict finding the defendants, Hubert T. Houston and Paine, Webber, Jackson and Curtis, Inc. ("Paine Webber"), jointly liable for violations of Section 12(2) of the Securities Act of 1933 (15 U.S.C. § 77*l*(2)), Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 of the Securities Exchange Commission, and Section 517.-301(1)(b) of the Florida Securities Act (Fla. Stat.Ann. § 517.301). The jury also found the defendants guilty of common law fraud and negligence. Paine Webber was held liable for the additional counts of violating Section 20 of the Securities Exchange Act (15 U.S.C. § 78t), negligent supervision of an employee, and breach of fiduciary duty to the plaintiff. Both defendants bring this appeal.

## I. STATEMENT OF FACTS

Dr. Arnold Silverberg, the plaintiff-appellee, is a veterinarian in Jacksonville, Florida. He was introduced to defendant-appellant Hubert T. Houston in 1970 when Houston managed Goodbody & Company's Jacksonville brokerage office. The two men commenced their business relationship shortly thereafter.

In 1970, Silverberg purchased approximately 10,000 shares of Tool Research and Engineering, Inc. He sold the stock in 1972 for a profit of almost $200,000. He immediately reinvested the funds in Masoneilan International, Inc. ("Masoneilan"), acquiring 34,000 shares over a five year period. Substantial volumes of this Masoneilan stock were purchased "on margin."[1] In 1977, Silverberg sold this stock, recognizing a profit in excess of $390,000, and reinvested in oil and gas stocks. Each of these transactions was conducted upon the advice of Houston.

In 1973, Houston began his employment with defendant-appellant Paine Webber in Palm Beach, Florida. Despite subsequent transfers by Paine Webber to its offices in Scottsdale, Arizona, Palm Desert, California, and Houston, Texas, respectively, Houston continued his relationship with Silverberg; the two men apparently conversed quite frequently by phone, discussing various investments in the stock market.

The stock transactions that culminated in the filing of this lawsuit began on November 22, 1977. That morning, Houston phoned Silverberg and told him that a valve manufacturer named Posi-Seal, Inc., was going to be acquired by another company at $12/share. Silverberg immediately purchased 2,000 shares at an average price of 5⅝. Over the next few months, Houston continued to call Silverberg and tell him that a merger was imminent between Posi-Seal and Masoneilan. Houston represented that this information came from Burt Gerber and Dick Barber, two Masoneilan employees who made purchases of Posi-Seal stock from Houston. Houston also mentioned an employee of Masoneilan's California plant, Nelson Jacobs, who was purchasing Posi-Seal stock and who allegedly told Houston that the Masoneilan plant would have to expand due to the merger. At trial, Gerber, Barber and Jacobs denied having any such conversations with Houston or having any knowledge of a pending merger between Masoneilan and Posi-Seal during

---

**1.** Purchasing on margin is a practice whereby an investor puts up only a portion of the cost of purchased securities and borrows the remainder of the money from the brokerage firm that handles the acquisition of the securities. It is a more risky investment since the investor may become immediately liable for a large portion of his investment (i.e. the amount borrowed from the brokerage firm) if the stock decreases in value, and brokerage firms therefore generally restrict the practice to sophisticated investors.

the relevant time period. Between November 23, 1977, and March 22, 1978, Silverberg purchased an additional 31,500 shares of Posi-Seal. The great majority of these purchases and subsequent acquisitions of Posi-Seal stock were on margin.

On March 29, 1978, Posi-Seal issued a news release which stated, "The company has no knowledge of any reason for the recent activity and price change in its stock." Silverberg testified that Houston told him to disregard the release since the merger discussions were taking place between Masoneilan representatives and two of Posi-Seal's major shareholders without the knowledge of Posi-Seal's president, the signer of the news release. Houston urged Silverberg to continue his purchases of Posi-Seal stock.

By mid-July, 1978, Silverberg owned approximately 60,000 shares of Posi-Seal. At that time, Silverberg attended a meeting of Posi-Seal's shareholders in Mystic, Connecticut. Silverberg met several of Posi-Seal's top officers, but testified that he did not discuss the pending Masoneilan merger with anyone at the meeting. Upon returning to Florida, Silverberg told Houston that he was unimpressed by Posi-Seal, but Houston asserted that the Masoneilan merger would occur regardless of Posi-Seal's financial position because of Masoneilan's desire to possess a patented valve developed by Posi-Seal.

Silverberg resumed his purchases of Posi-Seal stock in October 1978 based on Houston's representation that officers of Masoneilan and Posi-Seal were meeting to discuss the merger. Silverberg became concerned when the confirmation slips for these purchases were marked "unsolicited," but Houston told him to "disregard it, it doesn't mean anything;" in fact, Paine

Webber had ordered its brokers not to solicit anymore orders for Posi-Seal stock due to the substantial holdings of Paine Webber's clients in the company.[2]

In January 1979, when Houston told Silverberg that the merger agreement would be executed at a meeting of officers of Posi-Seal and Masoneilan's parent company, Silverberg's Posi-Seal holdings reached a peak of 82,000 shares.[3] Silverberg testified that all of his substantial purchases of Posi-Seal stock were based solely on Houston's recommendations.

On May 11, 1979, Posi-Seal announced a tentative agreement for it to be acquired by Xomox Corporation. A month later, Posi-Seal issued a news release stating that the acquisition would occur on terms less favorable to Posi-Seal's shareholders than had been previously announced. Though these events precipitated a decline in the price of Posi-Seal's stock, Houston urged Silverberg not to sell his holdings. Silverberg retained approximately 73,000 shares despite having to pay Paine Webber over $47,000 in order to meet margin calls.[4]

On November 5, 1979, Posi-Seal and Xomox announced the termination of their prior agreement. The price of Posi-Seal stock plummeted, and Paine Webber liquidated Silverberg's account when he was unable to meet further margin calls. In December 1979, Silverberg was advised that he was indebted to Paine Webber for an additional $25,276 which represented the deficit in his margin account after Paine Webber had liquidated his holdings. Silverberg filed this suit shortly thereafter.

## II. DISCUSSION OF ISSUES

### A. *Federal Securities Law Claims*

■ The defendants bring several challenges that go specifically to the jury's find-

---

**2.** The customers of Paine Webber's Palm Desert office alone were estimated to hold as much as eleven percent of Posi-Seal's outstanding stock.

**3.** Representatives of Masoneilan and Posi-Seal did in fact meet to discuss a possible merger in November 1978 and January 1979. However, the discussion never advanced beyond the most preliminary stages. Masoneilan's representa-

tives apparently told Posi-Seal's officers they were "crazy" to expect $10/share and the discussions terminated at that point.

**4.** "Margin calls" are the requests by brokerage firms for payments when stocks purchased on margin decrease in value. Such payments are necessary since the declining value of the stocks renders them insufficient collateral for the investor's debt.

ings that they were guilty of violations of federal securities law.[5] However, we need not consider these grounds for appeal since the jury returned a special verdict finding the defendants guilty on each of the eight counts brought by the plaintiff. Since the defendants do not allege specific error in the jury's findings that they acted negligently and fraudulently in violation of Florida law, we need consider only those contentions of the defendants which constitute a general attack on their liability under all eight of the substantive counts or which go to the question of damages.

This conclusion draws support from *LeSueur Creamery, Inc. v. Haskon, Inc.,* 660 F.2d 342 (8th Cir.1981), *cert. denied* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982). In that case, the jury returned a special verdict finding the defendant liable for breach of warranty, negligence and fraudulent misrepresentation. The appellate court noted that the defendant-appellant would have to prove that the plaintiff was not entitled to recovery under *any* of the three claims in order to justify the granting of a new trial. *Id.* at 347 n. 7. *See also Engine Specialities, Inc. v. Bombardier, Ltd.,* 605 F.2d 1, 17 (1st Cir.1979) ("By upholding one of the theories [of liability specified in the special verdict], we need not reach the question of whether the jury was likewise correct in premising liability on the second."),

*cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980).

Thus, in the present case, the defendants would be required to challenge successfully each of the eight counts on which they were found liable before this Court would remand for a new trial on the question of liability. Since the defendants have failed even to appeal specifically from the jury's finding of liability on the state law counts, we may dispense with any consideration of their challenges to the jury's finding of substantive liability under the federal securities law and turn to the single issue raised by the defendants which constitutes a general challenge to liability under all eight counts, the question of jury confusion.[6]

### B. *Jury Confusion*

At the agreement of the parties, the jury was initially provided with five general verdict forms. The first form was to be used if the jury found for Silverberg on the common law fraud claim and intended to award punitive damages.[7] The second form was to be used if the jury found for Silverberg on any of the claims and did not intend to award punitive damages.[8] The third form was to be used if the jury found in favor of the defendants. The fourth and fifth forms pertained to Paine Webber's

---

**5.** These contentions are: (1) that the trial court erred in not instructing the jury on the defense of *in pari delicto,* (2) that the court erred in not instructing the jury that the plaintiff must establish due diligence in order to recover under Rule 10b–5, and (3) that the court erred in instructing the jury that a plaintiff could recover interest paid on his margin account as damages under Rule 10b–5.

**6.** Though our research has not uncovered any prior cases from this Circuit which directly support our declination to review the defendant's attack on the jury's findings regarding the federal securities laws, we note that this Court has frequently held that a general verdict must be overturned and remanded for a new trial where the reviewing court finds insufficient basis for any *one* of the underlying counts which formed the basis of the suit below. *Jones v. Miles,* 656 F.2d 103, 106 (5th Cir.1981); *Smith v. Southern Airways, Inc.,* 556 F.2d 1347 (5th Cir.1977); *Jamison Co., Inc. v. Westvaco Corp.,*

526 F.2d 922, 935–6 (5th Cir.1976). This result follows of necessity since it is impossible to determine on which count the jury may have based its finding of liability. Moreover, it has also been noted that special verdicts greatly facilitate the process of appellate review. *Jones,* 656 F.2d at 106; *Jamison Co.,* 526 F.2d at 936; *Nardone v. Reynolds,* 538 F.2d 1131, 1137 n. 16 (5th Cir.1976). We may reasonably infer that these decisions envisioned the limited review we apply today in cases where the jury returns a special verdict.

**7.** An annotation of the bottom of the form stated, "This form is to be used only if the jury finds the defendants guilty of common law fraud and if punitive damages are awarded." This separate form was used for the fraud claim since it was the only claim which allowed possible recovery of punitive damages.

**8.** Each of these first two forms provided a space for the entry of compensatory damages.

counterclaim against Silverberg on the deficit balance in his margin account.

During its charge to the jury, the trial court instructed on the use of the forms for a finding of compensatory damages:

I have just instructed you with respect to eight separate and distinct claims which the plaintiff has made against the defendants. You may find the defendants liable on one or more or all of these claims. However, with respect to the claims for compensatory damages, that is, the damages to compensate the plaintiff for the loss or damage sustained by the plaintiff, the plaintiff can recover only one award of damages. Therefore, although you should consider each claim and award the plaintiff full and complete damages for each claim which the plaintiff has established by a preponderance of the evidence, there will only be one recovery in the amount determined by you.

When the jurors first returned from their deliberations, they had entered a finding of $530,000 in compensatory damages and $75,000 in punitive damages on the verdict form pertaining to common law fraud. The second form, pertaining to the other claims, had an entry of "0" in the space for compensatory damages, but was not signed or dated. The third form was left blank and, on the fourth and fifth forms, the jury found in Silverberg's favor on Paine Webber's counterclaim.

The court accepted the jury's verdict for Silverberg on Paine Webber's counterclaim, but ruled that the jury's failure to sign the second verdict form rendered any verdict as to Silverberg's eight claims invalid. It therefore ordered the jury to return to the jury room with the first three verdict forms for further deliberations, but stopped short of ordering the jury simply to sign and date the second form.

Ten minutes later, the jury returned with a newly-completed set of verdict forms. The jury again entered a verdict of $530,000 compensatory damages and $75,000 punitive damages on the first form, but had erased the "0" on the second form and entered a finding of $530,000 compensatory damages.

The second form was signed and dated. For reasons not entirely clear, the trial court again returned the jurors to the jury room, this time armed with special interrogatories by which the jury could indicate its finding as to each of the seven claims Silverberg maintained against the defendants other than the common law fraud claim.

Thirty-five minutes later, the jury returned again. The first form repeated its prior entries on compensatory and punitive damages, but now included a notation at the bottom indicating that Paine Webber was to be held fully liable for the $75,000 punitive damages. The second form entered compensatory damages of $605,000, a figure that the jury foreman revealed under questioning had been derived by adding compensatory and punitive damages. The special interrogatories unequivocally indicated that the jury found for Silverberg and against the defendants on each of the seven claims. At this point, the defendants moved for a mistrial on the grounds that the jury's failure to comply with the court's instructions demonstrated its inability to return a proper verdict. This motion was denied.

Based on the jury's improper inclusion of punitive damages in the damage award for the seven claims encompassed by the second verdict form, the court ordered the jury back to the jury room. The only change made by the jury was to delete the $605,000 award on the second verdict form and reenter a "0." The jury again returned the special interrogatories finding for Silverberg on all seven claims. The court accepted this verdict after individually polling each juror and entered judgment in favor of Silverberg for $530,000 compensatory damages and $75,000 punitive damages. The court subsequently denied defendants' motion for a new trial which was based in part on the alleged jury confusion. The defendants now contend that the trial court erred in denying their motion for a new trial.

A trial court's ruling on a motion for a new trial will not be overturned on

appeal absent a clear abuse of discretion. *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980) ("The authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the district court."); *Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp.,* 684 F.2d 1383, 1385 (11th Cir.1982). In the present case, each of the verdict forms returned by the jury clearly demonstrated its desire to award the plaintiff the damages entered by the trial court. Though the jury may have been somewhat confused as to the technical niceties of making such an award, the general verdict forms and special interrogatories together manifest an unmistakable intent to find for the plaintiff on all eight claims and to make awards in the above amounts. To have denied the plaintiff his just due in these circumstances would have bordered on a miscarriage of justice.

Moreover, the trial court's entry of judgment on all eight counts accorded with its duty to make every effort to reconcile inconsistent jury verdicts. *Aquachem Co., Inc. v. Olin Corp.,* 699 F.2d 516, 521 (11th Cir.1983); *Miller v. Royal Netherlands Steamship Co.,* 508 F.2d 1103, 1106 (5th Cir.1975). This Court has recognized that this requirement assumes constitutional dimensions. *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir.1973) ("The Seventh Amendment requires that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly.").[9]

In the present case, where a commonsensical interpretation of the various verdict forms returned by the jury makes clear its intent to find for the plaintiff on all eight counts and to return a specific and unwavering amount of damages and where special interrogatories fully and consistently supported the jury's findings, it is manifestly clear that the trial court did not abuse its discretion in denying the new trial motion.[10]

## C. *The Damage Award*

### 1. *The trial court's instruction on the measure of damages*

The trial court instructed the jury on the measure of damages as follows:

> If you find for the plaintiff, you should determine and write on the verdict form, in dollars, the total amount of loss or damage which the greater weight of the evidence shows he sustained as the result of the incident complained of. Those elements which you should consider in arriving at the amount of money damages which will constitute fair and adequate compensation for the loss or damage allegedly incurred include *the difference between the purchase price paid for the Posi-Seal stock purchased by the plaintiff and the price at which such stock was or could have been sold by the plaintiff when he learned of the alleged fraud...*

(emphasis added).

The defendants contend that this measure of damages is an improper formula for damages under Rule 10b–5. The defendants urge that prior decisions of this Court require a measure of damages under 10b–5 based on the difference between the purchase price of the securities and the actual market value of the securities on the date of purchase absent the misrepresentation.

Once again, however, we must decline to reach the precise issue raised by the defendants. Since the jury returned a spe-

**9.** *See also Stockton v. Altman,* 432 F.2d 946, 951 (5th Cir.1970) (Court of Appeals is "duty bound" to reconcile answers to interrogatories in district court if it can reasonably do so), *cert. denied* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971).

**10.** We must also note that the district court's above-quoted instruction on the manner of awarding damages on each of the counts was less than clear and no doubt contributed to the jury's inability to return a technically correct verdict. This Court has previously noted that a jury verdict inconsistent on its face does not require a new trial if the inconsistency may reasonably be attributed to the jury's misunderstanding of the jury instructions. *Willard v. The John Hayward,* 577 F.2d 1009, 1011 (5th Cir.1978).

cial verdict finding the defendants liable on all eight counts, we need only determine whether the damage instruction was proper as to any one of the eight counts in order to uphold the district court's entry of judgment.[11] A consideration of Florida case law demonstrates that the court's damage instruction was proper as to the common law fraud count and therefore obviates a need for us to determine the appropriateness of the instruction under the shifting and uncertain rules for damages under Rule 10b–5 and other provisions of federal securities law.

In *Strickland v. Muir,* 198 So.2d 49, 51 (Fla. D.C.A. 4th 1967), the plaintiffs brought a fraud action against an attorney-examiner for the Florida Securities Commission who submitted a report to the Commission making certain fraudulent representations regarding a newly-formed corporation. The plaintiffs, relying on this report, purchased stock in the company which was liquidated by a shareholders' committee shortly after its incorporation. The trial court awarded the plaintiffs the difference between the amount they had paid for the stock and the amount they received in the liquidation proceeding.[12]

On appeal, the *Strickland* defendants urged that damages should have been limited to "the difference between the actual value of the stocks and notes as of the time of purchase and their value had the facts been as misrepresented." *Id.* at 51. The appellate court, noting that no Florida court had previously considered the question, concluded that the "preferable rule" is the measure of damages applied by the trial court which allowed the plaintiff to recover "the amount he has actually lost." *Id.* at 51. However, the court remanded the case for a retrial on the issue of damages since the trial court, in assessing damages, had not considered that some of the stock acquired by the plaintiffs had been purchased prior to the defendant's misrepresentations.

Another Florida appellate court, citing *Strickland,* applied a similar measure of damages in *Evans v. Gray,* 215 So.2d 40 (Fla. D.C.A. 3d 1968), *cert. denied* 222 So.2d 748 (Fla.1969). Though the securities fraud claim brought in that case was dismissed for failure to state a cause of action, the court noted that "the test for recovery in misrepresentation cases in sale of corporate stock ... is that the recovery should be the diminution in value of the stock sold, or as bargained, and not whatever might have been an overstatement of assets of the corporation or an understatement of liabilities." *Id.* at 42.

Finally, in *DuPuis v. 79th Street Hotel, Inc.,* 231 So.2d 532 (Fla. D.C.A. 3d), *cert. denied* 238 So.2d 105 (Fla.1970), the Florida courts recognized the advantages of a more flexible approach to calculating damages in fraud cases. In remanding the case to the trial court, the appellate court sought to lend some guidance on the applicable measure of damages. While noting that Florida courts had most often measured damages based on the plaintiff's "loss" from time of purchase until time of sale, the court recognized that the state's courts had occasionally applied other measures of damages and stated, "It would appear that the Florida courts have adopted and followed both rules

---

11. *See* discussion, Section II. A., *supra.*

12. The Florida courts refer to this measure of damages, *i.e.* the difference between the amount the plaintiff paid for the stock and the amount the plaintiff recognized on sale of the stock, as the "out of pocket rule." The alternative measure of damages, the difference between the amount paid for the stock and the actual value on the date of purchase absent the misrepresentation, is referred to as the "benefit of the bargain rule." However, since courts and commentators have often confused these terms or used various other terms to describe identical measures of damages, we will at-

tempt, insofar as possible, to avoid tagging specific labels onto these methods of calculating damages. For a discussion of the various uses of these terms and application to particular cases, *see* Note, "The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities," 26 Stan.L.Rev. 371 (1974); Mullaney, "Theories of Measuring Damages in Security Cases and The Effects of Damages on Liability," 46 Fordham L.Rev. 277, 281–88 (1977); Jacobs, "The Measure of Damages in Rule 10b–5 Cases," 65 Geo.L.J. 1093, 1099–1125 (1977).

[of damages] in order to do justice as the circumstances demand." *Id.* at 536.

■ Thus, in the instant case, it was well within the trial court's discretion to instruct the jury to calculate Silverberg's damages on the common law fraud claim based on the total decline in the value of the stock. This is particularly true since there was absolutely no evidence adduced at trial indicating that the various prices Silverberg paid for the Posi-Seal stock did not in fact represent the true value of the stock on the dates of the purchases. Any such proof would have been difficult given that the defendants' misrepresentations (as far as the evidence at trial showed) were only directed at a single individual; the misrepresentations were not, as in most securities fraud cases, contained in a prospectus or other widely-disseminated document which might be assumed to have affected the expectations of each and every purchaser of the stock.

■ Though we recognize the harshness of this result given that the defendants were not the actual sellers of the stock and therefore must "rescind" by paying an amount they in fact never received, the substantial role played by the defendants in the transaction provides adequate justification for the award.[13] By finding the defendants guilty of common law fraud and negligence, the jury, presumably reasoning that "but for" the defendants' acts the plaintiff would not have purchased the stock, necessarily concluded that the defendants caused the losses suffered by the plaintiff.[14] From that point, the trial court's instructions merely assisted the jury in calculating the precise amount of the damages.[15]

■ The damage award returned by the jury also compensated the plaintiff for the interest he paid on his margin account, *i.e.* the interest charged by Paine Webber for advancing the funds that enabled the plaintiff to make purchases on margin. The

**13.** Analogously, we note that courts finding liability under Section 12(2) of the Securities Act of 1933 have allowed the application of a "rescissional" measure of damages identical to the measure applied in the instant case where the fraudulent party was either in privity with the defrauded party or where the fraudulent party's "participation in the buy-sell transaction is a substantial factor in causing the transaction to take place." *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980). For further discussion, *see Huddleston v. Herman & MacLean,* 640 F.2d 534, 554 (5th Cir.1981), *rev. in part on other grounds,* —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

**14.** The trial court's instructions on such are supported by *Navajo Circle, Inc. v. Development Concepts Corp.,* 373 So.2d 689, 691 (Fla. D.C.A. 2d 1979) and Restatement (2d) of Torts § 328A (1965).

**15.** By avoiding the question of the proper measure of damages under Rule 10b–5 and the other federal securities law claims, we do not mean to imply that the measure of damages in the instant case was necessarily improper under those statutes. Various federal courts have recognized the appropriateness of this measure in certain situations. *Huddleston,* 640 F.2d at 554; *Woolf v. S.D. Cohn & Co.,* 515 F.2d 591, 605 (5th Cir.), *vac. on other grounds,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1975); *Bird v. Ferry,* 497 F.2d 112, 113 (5th Cir.1974);

*Wolf v. Frank,* 477 F.2d 467, 478 (5th Cir.), *cert. denied* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1173 (2d Cir.1970); *Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357, 1361 (8th Cir.1977), *cert. denied* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978); *Arrington v. Merrill Lynch, Pierce, Fenner & Smith,* 651 F.2d 615, 620–21 (9th Cir.1981) ("plaintiff's damages in a 10b–5 case are limited by what they would have realized had they acted to preserve their assets ... when they first learned of the fraud or had reason to know of it."). In this regard we take special note of the Supreme Court's admonition in *J.I. Case v. Borak,* 377 U.S. 426, 433–34, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), that:

> It is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are involved. 'And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedies to make good the harm done.' *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946).

*See also John R. Lewis, Inc. v. Newman,* 446 F.2d 800, 805 (5th Cir.1971) ("Where a violation of ... Rule 10b–5 results in injury to a purchaser or seller of securities, federal courts may use any available remedy to make good the wrong done.").

defendants contend that they should not be held liable for this expense since Silverberg, with full knowledge of the mechanics of margin purchases, voluntarily undertook to acquire the Posi-Seal stock on margin. However, the jury might certainly have concluded that the plaintiff would not have purchased the stock on margin but for the defendants' misrepresentations and therefore concluded that his interest expense was the direct result of the defendants' fraudulent conduct. In such event, an award of interest expense would be proper.

### 2. Were the Compensatory Damages Excessive?

The defendants next contend that the evidence in the case does not support the amount of damages awarded by the jury. The defendants note that the damage instruction given by the court limited their liability for the declining market to the point in time when "the stock was or could have been sold by the plaintiff when he learned of the alleged fraud ..." The defendants urge that the plaintiff must surely have been aware of the alleged fraud when he received notice on May 11, 1979, that Xomox and Posi-Seal had announced plans to merge. The defendants especially rely on Silverberg's testimony that he knew a Masoneilan-Posi-Seal merger was impossible at that point. The defendants' motions for a new trial and for judgment notwithstanding the verdict on these grounds were rejected by the trial court.

 Our review of the sufficiency of the evidence supporting the jury's verdict is guided by the standards set forth by this Court *en banc* in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (*en banc*):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for a directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75. Applying this standard to the case before us, we find that the jury might reasonably have concluded that Silverberg was not aware of the alleged fraud until after the liquidation of his account.

 In the testimony relied on by the defendants, Silverberg simply stated that he knew a merger between Masoneilan and Posi-Seal was out of the question once the Xomox-Posi-Seal merger was announced on May 11.[16] At no point in his testimony did Silverberg give the slightest indication that he was aware of the defendants' fraudulent actions prior to the liquidation of his holdings with Paine Webber. In fact, in the period between the announcement of the

---

**16.** Silverberg's testimony at trial was as follows:

Q: Would it be fair to say that when you received this document dated May 11, 1979, you knew that the Masoneilan merger was off, it had to be, did it not?

A: (Silverberg) Yes, at that time I can't imagine they would be announcing a merger with one company and still be interested in another company.

Xomox merger and the liquidation of the plaintiff's account, the plaintiff, acting on Houston's advice, sold several thousand shares of Posi-Seal and reinvested the proceeds in various other stocks. Silverberg also testified that he continued to hold the bulk of his Posi-Seal stock on Houston's recommendation. These actions are hardly consistent with the behavior of an investor who believes he has been defrauded by his stockbroker. Furthermore, given the substantial profits that Silverberg had realized in prior years as a client of Houston and Paine Webber, it was certainly reasonable for him to conclude on May 11 that Houston had simply erred in anticipating the Masoneilan merger, a conclusion markedly different from knowledge that Houston had made statements which he knew, or should have known in the exercise of reasonable care, to be untrue.[17]

### 3. Were There Sufficient Grounds for Punitive Damages?

The defendants also allege that the trial court erred as a matter of law in submitting the question of punitive damages to the jury. The defendants contend that the record is devoid of evidence of the fraud, malice, wantonness, oppression or gross negligence necessary under Florida law to support an award of punitive damages. *See Nicholas v. Miami Burglar Alarm Co.,* 339 So.2d 175, 178 (Fla.1976); *Adams v. Whitfield,* 290 So.2d 49, 51 (Fla.1974). After a careful review of the record, we conclude that, under Florida law, sufficient evidence of wanton misconduct and gross negligence exists to justify the submission to the jury of the punitive damages question.

We rely primarily on *Griffith v. Shamrock Village,* 94 So.2d 854 (Fla.1957), where the Florida Supreme Court held that a lower court had erred in refusing to instruct the jury on the question of punitive damages. In that case, the plaintiff missed his brother's wedding because the defendant's employee failed to deliver a message regarding the wedding on the mistaken belief that the plaintiff no longer resided at the defendant establishment. Two days earlier, the plaintiff had complained to the defendant's management that mail addressed to him was being returned to senders marked "addressee unknown." The plaintiff brought suit seeking compensatory and punitive damages.

In overturning the trial court, the Supreme Court wrote:

> Malice could be imputed from the entire want of care or attention to duty, or great indifference to the persons, property or rights of others. This is consistent with the theory that punitive damages are allowed as a deterrent to commission by others of similar offenses ... There was evidence on which the jury could have found that there was an entire want of care or a want of slight care or attention by defendant to the duty it had assumed toward plaintiff. From this the jury could have imputed malice to the defendant.

*Id.* at 858. *See also Hanft v. Southern Bell Telephone & Telegraph Co.,* 402 So.2d 453 (Fla. D.C.A. 3d 1981) (upholding a jury award of punitive damages where defendant failed for two consecutive years to list plaintiff doctor in yellow pages); *Mercury Motors Express, Inc. v. Smith,* 393 So.2d 545, 547 (Fla.1981) ("punitive damages ... are imposed as a punishment of the defendant and as a deterrent to others").

In the present case, the defendants' conduct was far more reprehensible than the conduct in the above cases which was deemed sufficient to support an award of punitive damages. The jury could well have concluded that the defendant Houston, an employee of defendant Paine Webber, knowingly made false statements to the plaintiff on multiple occasions with the intent that the plaintiff rely on the misrepresentations. Furthermore, the evidence indicates that Houston and Paine Webber di-

---

**17.** We also note that the finding as to the precise amount of damages was amply supported by the testimony of Robert Johnson, a certified public accountant who testified on behalf of the plaintiff.

rectly profited from these misrepresentations by the receipt of commissions on the substantial quantities of stock purchased by the plaintiff. There can be no question but that the defendants' conduct exhibited at least the "want of slight care" which constitutes gross negligence under Florida law;[18] furthermore, a finding by the jury that the defendants acted with malice would also have been reasonable given the circumstances of the case.

Even were the evidence less compelling than that in the present case, we would be loath to interfere with the jury's factfinding responsibilities. As the Florida Supreme Court has noted:

> [Punitive damages] are peculiarly left to the discretion of the jury as the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression, or outrage found by the jury from the evidence.

*Winn & Lovett Grocery Co. v. Archer*, 171 So. 214, 221–22 (Fla.1936). We reject the defendants' challenge and uphold the jury's award of punitive damages.[19]

D. *Liability Under the Florida Securities Laws*

1. *Scienter as an Element of a § 517.301 Violation*

Finally, we consider the defendants' contention that the trial court erred in failing to instruct the jury that scienter is a necessary element of a violation of Fla.Stat.Ann. § 517.301,[20] a statute patterned closely after § 10(b) of the Securities Exchange Act. The defendants concede that *Merrill Lynch,*

*Pierce, Fenner and Smith v. Byrne*, 320 So.2d 436 (Fla. D.C.A. 3d 1975) specifically recognized that scienter is not an element of a § 517.301 violation, but urge that the court in that case relied on principles of federal law which were subsequently overruled in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), where the Supreme Court recognized scienter as a necessary element of a § 10(b) violation.

■ A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise. *King v. Guardian Life Ins. Co.*, 686 F.2d 894, 898 (11th Cir.1982); *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982). A federal court is bound by this rule whether or not the court agrees with the reasoning on which the state court's decision is based or the outcome which the decision dictates. *Delta Air Lines, Inc. v. McDonnell Douglas Corp.*, 503 F.2d 239, 245 (5th Cir.1974), *cert. denied* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975).

■ In the present case, there is no persuasive indication that the Florida Supreme Court would not choose to enforce § 517.301 without the requirement of a showing of scienter. Contrary to the defendants' assertions, the *Byrne* court did not unthinkingly adhere to federal case law which was overturned by *Hochfelder;* rather, the court cited both lines of federal authority, noted that neither was binding on it, and concluded that the state law

---

18. *Griffith*, 94 So.2d at 858.

19. We note that Florida courts have authorized the award of punitive damages in two prior securities fraud cases, yet we choose not to rely on those cases since the evidence in each presented an even stronger case for punitive damages than that before us now. *See Dunn v. Shaw*, 303 So.2d 6 (Fla.1974) (defendant had prior conviction for stock fraud and plaintiffs were unknowledgeable of stock market, retirees, and one was blind); *Dean Witter Reynolds, Inc. v. Leslie*, 410 So.2d 961 (Fla. D.C.A. 3d 1982) (defendant stockbroker consistently

ignored express instructions of plaintiff causing plaintiff's securities to become worthless).

20. Though our prior statement of intent to avoid any consideration of the defendants' challenges to liability under federal securities law would normally apply with equal force to challenges to liability under state securities law, it is necessary for us to dispose of this issue since the violation of the Florida blue sky statute is the only substantive violation proved by the plaintiff for which he might be entitled to recover attorney's fees.

would be best enforced without a scienter requirement. 320 So.2d at 440. We are especially hesitant to overturn a state court's interpretation of a state law where the law has been interpreted so as to provide more stringent protection for the citizens of the state than the parallel federal statute provides to persons seeking remedies under federal law.

### 2. *Necessity of an Instruction on* In Pari Delicto

The defendants contend further that the trial court erred in not giving an instruction to the jury on the defense of *in pari delicto* on the grounds that Silverberg was of equal fault with the defendants since purchases were made on his behalf on the open market when he was in possession of inside information which federal law required him to disclose to the sellers of the securities. We must quickly dispose of this contention since it goes to the viability of the Florida blue sky claim against the defendants.

In *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the Supreme Court held that guilt arises under § 10(b) of the Securities Exchange Act for the improper use of inside information only when the person possessing the inside information is under some duty to disclose the information. The Court noted that the defendant in that case, a financial printer who derived information of a pending takeover from unpublished materials and purchased securities on the open market in reliance on that information, was under no such duty since he was not a corporate insider and did not receive the information from the target company. 445 U.S. at 231, 100 S.Ct. at 1116. The Court also relied on the fact that Chiarella had no fiduciary or agency duties to the persons he purchased the securities from. In fact, noted the Court, he was a "complete stranger" to those persons. *Id.* at 232–33, 100 S.Ct. at 1116–17. In the present case, Silverberg's actions as a purchaser on the open market were indistinguishable from the actions ruled non-criminal in *Chiarella*.

This Court has held that the *in pari delicto* defense is appropriate only where the fault of the parties is "mutual, simultaneous and relatively equal" and where the plaintiff is an "active, essential, and knowing participant in the unlawful activity." *Woolf*, 515 F.2d at 604; *James v. DuBreuil*, 500 F.2d 155, 158–59 (5th Cir.1974). In the present case, where the plaintiff engaged in no illegal activity under either federal or state securities law, an instruction on the *in pari delicto* defense would clearly have been in error.

### III. CONCLUSION

The judgment of the trial court is AFFIRMED.