**DISTRICT OF COLUMBIA and Barbara Rauf, Appellants,**

v.

**Steven J. TULIN, Appellee.**

**No. 08–CV–1116.**

District of Columbia Court of Appeals.

Argued Feb. 25, 2010.
Decided May 13, 2010.

Holly M. Johnson, Assistant Attorney General for the District of Columbia, with whom Peter J. Nickles, Attorney General, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellants.

Gregory L. Lattimer, Washington, DC, for appellee.

Before FISHER, Associate Judge, and BELSON and SCHWELB, Senior Judges.

SCHWELB, Senior Judge:

On the morning of October 22, 2004, Steven Tulin was arrested for reckless driving following an automobile accident in which his silver Porsche automobile was "rear-ended" by Detective Barbara Rauf of the District of Columbia Metropolitan Police Department ("MPD"), driving a green Honda. Mr. Tulin was handcuffed, taken to the central lock-up in a police van, and held in custody for approximately fourteen hours until his release at 11:20 p.m. The following April, Mr. Tulin was tried on the reckless driving charge and found not guilty.

On October 26, 2005, Mr. Tulin brought suit against Detective Rauf and the arresting officer, Leticia McKoy, for false arrest, malicious prosecution, and intentional infliction of emotional distress, and against the District of Columbia ("the District") for negligent supervision. The jury found Detective Rauf liable for intentional infliction of emotional distress, but not for false arrest or malicious prosecution. It found the District liable for negligently supervising Officer McKoy, but in favor of Officer McKoy on all of the claims against her. The jury awarded Mr. Tulin $450,000 in compensatory damages against both Detective Rauf and the District. The trial judge denied a motion to set aside the verdict, and judgment was entered accordingly.

On appeal, the District contends that the evidence was insufficient as a matter of law to establish negligent supervision. The District and Detective Rauf also assert that the verdicts against them were inconsistent with certain of the jury's other findings unfavorable to Mr. Tulin. We are not persuaded by any of these contentions. Accordingly, we affirm.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. *The Collision*

The traffic accident which led to this litigation was described by the trial judge as "a minor traffic stop," but it apparently generated a significant measure of road rage. On the morning of the incident, which occurred during the rush hour, Mr. Tulin, a clinical psychologist at Walter Reed Hospital, had been traveling north on Fourteenth Street, N.W., and he was preparing to make a left turn onto Newton Street. Detective Rauf, who was driving her son to school, was in the vehicle immediately behind Mr. Tulin.

The versions of the accident provided by the two principals differed markedly from one another. Mr. Tulin and Detective Rauf each blamed the other for the collision and for what followed. It is undisputed, however, that after some less than friendly looks and gestures by both drivers, Detective Rauf's right front bumper struck Mr. Tulin's rear left bumper. Explaining the collision, Detective Rauf claimed that after she honked her horn at Mr. Tulin for failing to make a left turn in front of her when there was no oncoming southbound traffic, Mr. Tulin engaged in a series of provocative acts, twice slamming his brakes and suddenly stopping, and then speeding off in front of her, with his tires screeching. Detective Rauf testified that when Mr. Tulin's car finally stopped for a third time, "on a dime," it was impossible for Detective Rauf, who said she was at least one car length behind Mr. Tulin, to avoid a collision. According to Detective Rauf, it was "the [reckless] manner in which [Mr. Tulin] was operating his vehicle which caused me to crash into him." [1]

Mr. Tulin testified that, as he was edging out into the intersection of Fourteenth

1. Mr. Tulin admitted that he had estimated his speed at twenty-five miles per hour, and

and Newton Streets to make a left turn, he heard the honking of a horn behind him. He looked in his left side-mirror and saw Detective Rauf apparently trying to go around him in order to make the left turn before he could do so. Concluding that the driver behind him was "in a big hurry," he completed his left turn, and he then stopped his car on Newton Street to allow Detective Rauf to pass. To Mr. Tulin's astonishment, however, Detective Rauf stopped her vehicle next to his and appeared to be gesturing in a scolding manner. Mr. Tulin testified that when Detective Rauf resumed driving, she lurched forward, an event which "would happen if you put your foot down hard." [2] Thinking that he "just wanted to get ahead of this person," Mr. Tulin accelerated. He stopped accelerating when he reached the speed of twenty-five miles per hour. As he shifted to second gear, however, he felt his car being struck from behind by Detective Rauf's vehicle. According to Mr. Tulin, the damage to his vehicle caused by the collision included a "ripped bumper," as well as sufficient damage to the exhaust system to require its replacement. He testified that his repair bill was $3500.[3]

### B. The Police Investigation

Following the accident, Detective Rauf and Mr. Tulin had a "hostile interaction," during which both of them were apparently extremely angry. Detective Rauf acknowledged that she was upset and cursing and using all kinds of profanity,[4] because her "level of pissitivity" was fairly high. Detective Rauf called the police operator and requested assistance; she called a second time "because they didn't come" and because "it seemed like forever." Soon thereafter Officer McKoy arrived on the scene. Officer McKoy testified that she had responded to a call for an officer in trouble. She interviewed Detective Rauf,[5] Mr. Tulin,[6] and two witnesses to the accident. Officer McKoy stated that, in her view, Detective Rauf's version was more credible, and that it was corroborated by the disinterested wit-

---

that the speed limit on Newton Street is fifteen miles per hour when children are present. On redirect examination, however, he denied that there were children present or that there was a school nearby.

**2.** Detective Rauf provided a remarkable explanation of what she believed to be Mr. Tulin's motivation. She testified that she did not believe that Mr. Tulin wanted to be arrested, but that he did want "to create a lawsuit." The following exchange ensued:

Q. So, he wanted you to run into his $120,000 Porsche so he could get a lawsuit?
A. Sure, that is my belief.

**3.** Detective Rauf found Mr. Tulin's claim regarding the amount of damage to his car incredible. She claimed that she did no more than scratch his vehicle, and that her own car was scratched as well.

**4.** The level of Detective Rauf's anger is reflected by her own testimony. She stated that she told Mr. Tulin that "[t]hat is some fucked up shit what you did." She further testified that "I was shaken. I was mad. I was pissed is what I was. I wasn't mad. I was pissed."

**5.** Officer McKoy asked Detective Rauf if she was related to Captain Rauf, and Detective Rauf reluctantly confirmed that the Captain, from whom she was separated, was indeed her husband. Captain Rauf was assigned to the Fourth Police District, where Officer McKoy was also employed.

**6.** Mr. Tulin denied that Officer McKoy ever talked to him at all regarding how the accident happened. Officer McKoy testified that Mr. Tulin had described the accident, and his account, as related by Officer McKoy, was substantially identical to his trial testimony. Officer McKoy was, however, impeached with her testimony at her deposition; she had stated at that time that she did not recall what Mr. Tulin had told her. There was no reference in Officer McKoy's notes or in her report to Mr. Tulin's version of the accident.

nesses.[7] She acknowledged, however, that she looked for skid marks which would suggest that a car's brakes had been slammed, but she found none.

While or soon after Officer McKoy was conducting her interviews, Sergeant Johnnie Lee McLean and Sergeant Jackson[8] also arrived on the scene. Sergeant McLean testified that he had responded to a "priority" call, which meant that somebody's life was in danger. Officer McKoy told Sergeant McLean that she had interviewed the "two uninvolved witnesses who had [seen] the accident from beginning to end." She asserted that, according to these witnesses, Mr. Tulin had been driving his car in a "careless" manner, and kept "pulling off, hitting his brakes, pulling off, hitting his brakes." *Id.* During a withering cross-examination, however, Sergeant McLean made a number of telling admissions regarding the shortcomings of the investigation that led to Mr. Tulin's arrest.

After she had completed her interviews of the witnesses, Officer McKoy told Detective Rauf that she could leave. Mr. Tulin testified that, as Detective Rauf was returning to her car, she said to Officer McKoy: "That's an automatic lock-up, isn't it?" According to Mr. Tulin, Officer McKoy responded: "Yes." Detective Rauf acknowledged that she inquired whether Mr. Tulin would be arrested.

## C. *The Jury's Verdict*

After the presentation of evidence had been completed, and following the closing arguments of counsel, the trial judge submitted the case to the jury with a detailed verdict form. The form contained a separate interrogatory for each claim against each of the defendants. The jury returned a verdict in favor of Officer McKoy with respect to all of Mr. Tulin's claims against her. The jury found that Detective Rauf was not liable for false arrest or malicious prosecution, but that she had intentionally inflicted emotional distress. *Id.* The jury also found that the District had negligently supervised Officer McKoy, but not Detective Rauf.

Before the jury was discharged, counsel for the District moved to resubmit the case to the jury with an instruction that the verdict was inconsistent. Counsel argued that the verdict in favor of Officer McKoy on all counts was inconsistent with the jury's finding that the District was negligent in its supervision of Officer McKoy. Counsel also contended that the jury's finding that Detective Rauf was liable to Mr. Tulin for intentional infliction of emotional distress was inconsistent with its verdict in Detective Rauf's favor with respect to the claims of false arrest and malicious prosecution. The trial judge denied the District's request and discharged the jury.

The District and Detective Rauf submitted a timely post-trial motion for judgment as a matter of law, or in the alternative, for a new trial or a remittitur. After hearing argument, the trial judge denied the motion from the bench. This appeal followed.

## II.

## LEGAL ANALYSIS

On appeal, the District contends that the evidence was insufficient to warrant impo-

---

7. Three local residents, all of them strangers to the two drivers, testified at the trial. One of them gave an account tending to favor Mr. Tulin's version, but she was impeached with prior testimony in which she had stated that she did not witness the accident. The other two witnesses substantially corroborated Detective Rauf's account regarding Mr. Tulin's sudden stopping and starting.

8. Sergeant (later Lieutenant) Jackson has since retired.

sition of liability for negligent supervision, and that judgment as a matter of law should have been entered in the District's favor. In the alternative, the District asserts that it is entitled, at a minimum, to a new trial, because the verdict against the District for negligent supervision was fatally inconsistent with the jury's finding in favor of Officer McKoy with respect to all of the allegations of tortious conduct on her part. Detective Rauf claims that she is entitled to a new trial because, according to her, the jury's finding that she was not liable for false arrest or malicious prosecution cannot be reconciled with the verdict against her for intentional infliction of emotional distress. We address each of these contentions in turn.

## A. *The Sufficiency of the Evidence of Negligent Supervision*

### (1) *Standard of Review*

■ The question whether the evidence was sufficient to go to the jury is one of law, and we review *de novo* the trial court's refusal to direct a verdict or to grant judgment as a matter of law. *Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 174 (D.C.1998). In resolving this question, we apply the same standard as does the trial court in ruling on a motion for a directed verdict. *District of Columbia v. Billingsley,* 667 A.2d 837, 840 (D.C.1995). We must view the evidence in the light most favorable to Mr. Tulin, as the non-moving party, and Mr. Tulin is entitled to every reasonable inference from the evidence. *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C.1990). In *Etheredge v. District of Columbia,* 635 A.2d 908 (D.C.1993), we further elaborated on the applicable standard as follows:

> It is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court

may properly grant judgment notwithstanding the verdict. *Levy v. Schnabel Found. Co.,* 584 A.2d 1251, 1254–55 (D.C.1991); *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C.1979). Moreover, it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of the witnesses. *Rich, supra,* 410 A.2d at 534 (citations omitted). If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury. *Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc).

*Id.* at 915–16.

## B. *Negligent Supervision*

■ The trial judge instructed the jury, without objection, that

> to establish a cause of action for negligent supervision, a plaintiff must show, number one, that the employer knew or should have known [that] its employee behaved in a dangerous or otherwise incompetent manner; number two, that the employer armed with the actual or constructive knowledge failed to adequately supervise the employee.

This instruction was consistent with this court's precedents. We have explained, with respect to a claim of negligent supervision, that

> [t]o invoke this theory of liability it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.

*Giles v. Shell Oil Corp.,* 487 A.2d 610, 613 (D.C.1985). In addition, in *Brown v. Argenbright Sec. Inc.,* 782 A.2d 752 (D.C. 2001), this court quoted the definition of

negligent supervision in the RESTATEMENT OF AGENCY, as follows:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> > (a) in giving improper or ambiguous orders o[r] in failing to make proper regulations; or
> >
> > (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;
> >
> > (c) in the supervision of the activity; or
> >
> > (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

RESTATEMENT (SECOND) OF AGENCY § 213 (1958).

*Id.* at 760 n. 10. Mr. Tulin claims that the District, through Sergeants McLean and Jackson, engaged in negligent supervision by failing adequately to supervise Officer McKoy's activities in relation to Mr. Tulin's arrest.

The District contends that Mr. Tulin's proof failed because he presented no expert testimony to establish the standard of care. The trial judge rejected this contention. In denying the defendants' post-trial motion, the judge explained that

> expert testimony was not required because this was an activity that was not outside the [ken] of lay jurors and that, [in] the totality of the circumstances . . ., it was within the realm of common knowledge and every day experience.

■■■ We review for abuse of discretion the trial court's determination as to wheth-er expert testimony was necessary. *In re Melton,* 597 A.2d 892, 897–99 (D.C.1991) (en banc). We discern no such abuse here. Expert testimony is required when the standard of care is "beyond the ken" of a lay jury. *See, e.g., Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195 (D.C.1991). As we reiterated in *Beard,*

> [t]he rationale for requiring expert testimony was well stated two-thirds of a century ago in a losing cause; courts should not leave it to "a jury of tailors and haberdashers to pass judgment [unaided by expert testimony] on how to make a wet and rolling deck in a seaway a safe place to work." *Zinnel v. United States Shipping Bd. E.F. Corp.,* 10 F.2d 47, 49 (2d Cir.1925) (dissenting opinion).

*Id.* at 200.

This, however, is not a case in which lay jurors would be unable to grasp the issues without expert assistance. The testimony on cross-examination of Sergeant McLean provided ample evidence from which an impartial jury could, without the need for expert guidance, reasonably infer that the District's supervision of Officer McKoy was negligent. In response to a question by Mr. Tulin's attorney, Sergeant McLean stated that "[r]eckless driving is where someone's driving a vehicle, and they [sic] intentionally drive in a careless manner where they are endangering people's live[s] or property." McLean then acknowledged that there is no law against stopping, even "abruptly," and he agreed that "the only way this becomes a problem is if someone is behind you and they [sic] can't stop because you have stopped." He also acknowledged that there is a District of Columbia statute prohibiting following too closely.[9]

---

9. Sergeant McLean was presumably referring to 18 DCMR § 2201.9 (2001), which provides:

> The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the

After describing Detective Rauf's account of the collision as reported to him by Officer McKoy, Sergeant McLean acknowledged that he did not ask Detective Rauf, and did not know, either how fast she was traveling or how far she was behind Mr. Tulin when he stopped. The cross-examination continued as follows:

Q At the time he pulled off, how far away was she behind him?

A I don't know.

Q Did you ask?

A No, sir.

Q Before you had this man arrested, did you conduct an investigation to determine whether she was five feet, ten feet, thirty feet behind?

A The way she described it to me, it didn't appear—I can only tell you the way she told me.

Q You are an experienced police officer?

A Yes, sir.

Q In an investigation appearances mean nothing only facts. Ain't that right?

A Yes, that is true.

Q So, what appeared to be don't mean a thing? The question is, did you ask her were you one car length behind, two car lengths behind? How far behind was she at the time he stopped?

A No, sir, I don't recall asking her that.

Q You didn't ask that before you had this man arrested, right?

A No, sir.

Q You all had made a decision that he was going to be arrested and she

[Detective Rauf] could go on her way, right?

A Yes, sir.

Sergeant McLean then acknowledged that in the District of Columbia "reckless driving is arrestable only under certain circumstances," and that "you can't just arrest somebody for a misdemeanor that is not committed in your presence." He also confirmed that although Officer McKoy was not at the scene when the alleged reckless driving occurred, it was she who made the arrest. The cross-examination then continued as follows:

Q Well, what other police officer witnessed it?

A Had Officer McKoy witnessed it, then, yes. She can make an arrest. Other than that—.

Q In this case the exception that you all were using was the fact that Detective Rauf had seen, it correct?

A Yes, sir.

Q And, so, that gave you the ability to arrest without a warrant because otherwise you would have needed a warrant, correct?

A That is correct, sir.

In other words, Sergeant McLean and Sergeant Jackson authorized Mr. Tulin's warrantless arrest, which could be lawful only because Detective Rauf, the driver who had run into the car in front of her, was a police officer and was present when the accident occurred. They did so without even asking the Detective, who was the presumptively culpable following driver, how fast she was going and how far she was behind Mr. Tulin's car. Viewing the record, as we must, in the light most favorable to Mr. Tulin, *Etheredge*, 635 A.2d at

speed of the vehicle and the traffic upon and the condition of the roadway.

This court has stated that "[i]n the absence of an emergency or unusual conditions, the fol-

lowing driver is negligent if he [or she] collides with the forward vehicle." *Fisher v. Best*, 661 A.2d 1095, 1099 (D.C.1995) (citation omitted).

915, we have no difficulty in concluding that an impartial trier of fact could fairly find that the two sergeants' authorization of the arrest, without any inquiry on their part into this critical information, constituted negligent supervision of Officer McKoy.

The District also contends, relying primarily on *Stewart–Veal v. District of Columbia*, 896 A.2d 232 (D.C.2006), that "the theory of negligence apparently adopted by the trial court—that the supervisory officers negligently ordered Mr. Tulin's arrest—is not recognized in this jurisdiction." [10] This is so, according to the District, because "[s]uch conduct is inextricably intertwined with the intentional tort of false arrest and therefore is not actionable as negligence." In our view, however, the District's position is not only counter-intuitive—supervisors can surely be negligent by not informing themselves properly and by thus authorizing or failing to prevent an unlawful arrest—but it is also contrary to the holding in *Stewart–Veal.* In that case, this court, *inter alia,* reversed the dismissal of a claim against the District for negligent hiring, training and supervision of its police officers, where the offi-

cers involved were alleged to have falsely arrested the plaintiff and to have committed several other intentional torts. We held that "[t]his claim alleging negligence in hiring, training and supervision was a separate and distinct cause of action, and was not fatally intertwined with the intentional tort causes of action." *Id.* at 237.

### C. *The Alleged Inconsistency Between the Finding of Negligent Supervision by the District and the Verdict in Favor of Officer McKoy*

■ The District next contends that because the jury absolved Officer McKoy of false arrest (and of any other tortious conduct), it could not logically find the District liable for negligently supervising her. The two verdicts, according to the District, are intrinsically inconsistent. In essence, the District's argument is that Officer McKoy's superiors could not have negligently failed to prevent her from committing a tort if she did not commit that tort. We disagree with the District's framing of the issue, and therefore with its conclusion.

■ We begin by summarizing the law pertaining to allegedly inconsistent

---

10. The District's claim that a negligent supervision claim such as the one asserted by Mr. Tulin is not recognized "in this jurisdiction" is apparently designed to differentiate District of Columbia law from the law elsewhere, and particularly from the RESTATEMENT OF AGENCY. As previously noted, however, in *Brown v. Argenbright Sec., Inc.,* 782 A.2d at 760 n. 10, this court made explicit reference to the standard set forth in that Restatement. Moreover,

> [w]e ought not to assume too readily that our decisions should be construed in a way that makes them inconsistent with the Restatement, which is written by the American Law Institute (ALI), an organization comprised of especially distinguished judges, attorneys, and scholars. *See, e.g., Poretta v. Superior Dowel Co.,* 153 Me. 308, 137 A.2d 361, 373 (1957). "The Restatement may be regarded both as the product

of expert opinion and as the expression of the law by the legal profession." *Id.* Although we are not required to follow the Restatement, we should generally do so "where we are not bound by the previous decisions of this court or by legislative enactment, ... [for] by so doing uniformity of decision w[ill] be more nearly effected." *Smith v. Normart,* 51 Ariz. 134, 75 P.2d 38, 42 (1938); *see also Ellis v. James V. Hurson Assocs.,* 565 A.2d 615, 618 (D.C.1989); *Gallimore v. Washington,* 666 A.2d 1200, 1213–14 (D.C.1995) (dissenting opinion) (addressing an issue not reached by the majority). *Richardson v. Nationwide Mut. Ins. Co.,* 826 A.2d 310, 322 n. 15 (D.C.), *pet. for rehearing en banc granted and decision vacated on other grounds,* 832 A.2d 752 (D.C.2003). The *Richardson* case was subsequently settled before *en banc* argument could be held.

verdicts. In criminal cases, inconsistent verdicts, while not favored, *Whitaker v. United States,* 617 A.2d 499, 503 (D.C. 1992),[11] are generally allowed to stand. *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *see also United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). In civil cases, on the other hand, irreconcilable verdicts are taboo, for in a case in which such a verdict has been returned, the jurors

> either mistakenly or arbitrarily failed to perform their duty. Both verdicts cannot be right, and in such circumstances courts have set aside both verdicts and awarded a new trial.

*Lansburgh & Bro. Inc. v. Clark,* 75 U.S.App. D.C. 339, 341, 127 F.2d 331, 333 (1942); *see also* Super. Ct. Civ. R. 49(b) ("[w]hen the answers [to written interrogatories] are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered; but the [c]ourt shall return the jury for further consideration of its answers or verdict or shall order a new trial"); *Estate of Underwood v. National Credit Union Admin.,* 665 A.2d 621, 645 (D.C.1995); *Bowler v. Stewart–Warner Corp.,* 563 A.2d 344, 348 (D.C.1989).

A corollary to the proscription of inconsistent verdicts in civil litigation is that "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, *they must* be resolved [in] that way." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) (emphasis added); *accord, Bowler,* 563 A.2d at 348 (quoting 76 Am. Jur. 2d *Trial,* § 1196, at 158 (1975) (quot-

ing *Atlantic & Gulf Stevedores*)).[12] The court's duty to harmonize the answers, if it is reasonably possible to do so, arises from the Seventh Amendment's guarantee of the right to a jury trial. *Id.*; *see also Gallick v. Baltimore & Ohio Ry. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) ("[i]t is fundamental that every attempt must be made to harmonize a jury's verdict.... We therefore must attempt to reconcile the jury's findings, *by exegesis, if necessary* ... before we are free to disregard the jury's verdict and remand the case for a new trial.") (emphasis added, citations omitted).

The applicable principles have been effectively summarized at 75 B. Am.Jur. 2d *Trial,* § 1586, at 378–80 (2007)—a later edition of the authority cited by this court in *Bowler*—and we quote from that treatise at some length:

> A court may harmonize inconsistent responses in a special verdict by exercising its own powers of interpretation. Only where verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside. To justify setting aside an otherwise valid jury verdict, special verdict answers must be ineluctably inconsistent. The presumption on appeal is that jurors do not intend to return conflicting answers, but rather the contrary. As a general rule, a reviewing court indulges every reasonable presumption in favor of the legality of the verdicts. Where special verdict answers appear to be inconsistent but there is a view of the case that makes the jury's answers consistent, they must be resolved that way. If the answers to special verdict questions can be recon-

---

11. "Toleration of a necessary evil, in other words, is not to be mistaken for the exuberant or joyful contentment with which we welcome a thing of beauty." *Id.*

12. The quoted language from *Atlantic & Gulf Stevedores* was repeated verbatim by this court in *Bowler.*

ciled on any theory, the verdict will not be disturbed.

The trial court possesses broad discretion in attempting to harmonize inconsistent answers. The applicable standard is whether the answers can be reconciled in any reasonable manner consistent with its fair inferences. If it is impossible to harmonize such answers, then they cancel one another out and should be disregarded by the court. A court may not strike down conflicting jury answers if there is any reasonable basis upon which they may be reconciled. The reviewing court, upon reviewing the jury's answers, must not determine whether the findings may be viewed as conflicting, but rather, must ascertain if there is any reasonable basis upon which the answers may be reconciled.

(Footnotes containing extensive authorities from numerous jurisdictions omitted.)

In light of the strong constitutionally-based policy in favor of harmonizing, where reasonably possible, apparently inconsistent verdicts (or a jury's arguably inconsistent answers to interrogatories), some courts have held that a jury's facially inconsistent verdict does not require a new trial if the inconsistency can fairly be attributed to the jury's misunderstanding of the court's instructions. *Keehr v. Consolidated Freightways of Delaware, Inc.,* 825 F.2d 133, 138 n. 7 (7th Cir.1987); *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 685 n. 10 (11th Cir. 1983). In *Keehr,* the court, "indulg[ing] every reasonable presumption in favor of the legality of jury verdicts," affirmed a judgment based on ostensibly inconsistent verdicts—for the plaintiff as to invasion of privacy but against her as to defamation—on the ground, *inter alia,* that the jury may have misunderstood a key instruction:

> Cynthia testified that she was not aware of any damage to her reputation resulting from Nisun's statement. Under the court's instructions on slander, Cynthia's testimony should not have precluded the jury from returning a verdict in her favor on the defamation claim. Her testimony went only to the question of damages. The jury, however, might have thought that, without any evidence of damage to her reputation, it could not find for Cynthia on this claim.

825 F.2d at 138 n. 7. In *Silverberg,* the court found it to be "manifestly clear" that the trial court did not abuse its discretion in denying the new trial motion because "a jury verdict inconsistent on its face does not require a new trial if the inconsistency may reasonably be attributed to the jury's misunderstanding of the jury instructions." 710 F.2d at 685 n. 10.[13]

In light of these principles, we conclude that the trial judge did not abuse her broad discretion, *see, e.g., Strauss v. Waseca Vill. Bowl,* 378 N.W.2d 131, 133 (Minn. Ct.App.1985) and authorities there cited, in concluding that the jury's verdict in favor of Officer McKoy with respect to the tort claims against her was not irreconcilable with its finding of liability against the District for negligent supervision. The judge had instructed the jury that it was a valid defense to unlawful arrest "if the officer reasonably believed in good faith that her conduct towards the plaintiff was lawful." Further, the judge added that in determining whether the arrest was made in good faith, "you must consider the evidence from the defendant's perspective, not from

---

**13.** In this case, for the reasons stated herein, we are of the opinion that the verdicts challenged by the appellants as inconsistent are reconcilable if the jury followed the trial judge's instructions as given. We therefore need not decide the question addressed by the courts in *Keehr* and *Silverberg.*

the plaintiff's perspective." Given Detective Rauf's pointed question whether "that's an automatic lock-up" and the apparent view of Sergeants McLean and Jackson that Mr. Tulin should be arrested, the jury could reasonably find that Officer McKoy—the lowest police person on the totem pole or, in the words of Mr. Tulin's counsel, the "puppet" rather than the "puppeteer"[14]—believed in good faith that she had the legal right and obligation to make the arrest. For the reasons set forth in Part III of this opinion, however, the jury could further fairly conclude that regardless of Officer McKoy's *bona fide* but mistaken belief to the contrary, the sergeants at the scene should have recognized that the investigation was inadequate and that the arrest was unlawful, but that they nevertheless failed to prevent Officer McKoy from making it. Accordingly, the jury could reasonably find that the District, through Sergeants McLean and Jackson, was negligent in its duty to supervise Officer McKoy and to protect Mr. Tulin from a wrongful arrest. Such a finding was not "ineluctably inconsistent"[15] (or indeed, inconsistent at all) with the jury's determination that Officer McKoy was not personally liable for false arrest.[16]

For the foregoing reasons, we discern no error in the award against the District for negligent supervision.

**D.** *The Alleged Inconsistency Between the Finding that Detective Rauf did not Unlawfully Arrest or Maliciously Prosecute Mr. Tulin and the Award of Damages Against Her for Intentional Infliction of Emotional Distress*

 " 'To succeed on the claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.' " *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C.2008) (quoting *District of Columbia v. Thompson*, 570 A.2d 277, 289–90 (D.C.1990)). " 'Liability will not be imposed for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Carter v. Hahn*, 821 A.2d 890, 892–93 (D.C.2003) (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C.1998)). Instead, to be actionable, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 893 (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C.2002)). Intentional infliction of emotional distress has been characterized as the "tort of out-

---

**14.** We note, however, that Officer McKoy was no rookie. She had worked for the Metropolitan Police Department for almost nineteen years.

**15.** *Roach v. Roach*, 735 S.W.2d 479, 482 (Tex. Ct.App.1987).

**16.** The District contends that our decisions in *Fred A. Smith Mgmt. Co. v. Cerpe*, 957 A.2d 907 (D.C.2008), and *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564 (D.C.2007), compel a different result. In our view, these cases are not dispositive here. We held in *Griffin*, and reiterated in *Fred A. Smith*, that a plaintiff may

not base a claim of negligent supervision on an employee's alleged violation of a statutorily created duty, because a common law claim of negligent supervision must be "predicated only on common law causes of action or duties otherwise imposed by the common law." *Fred A. Smith*, 957 A.2d at 916 (quoting *Griffin*, 925 A.2d at 576). We had no occasion to decide whether a plaintiff must receive a favorable decision on his or her tort claim against the employee in order for a claim of negligent supervision against the employer to be meritorious, and we did not do so.

rage." *Bettis v. Islamic Republic of Iran,* 354 U.S.App. D.C. 244, 255, 315 F.3d 325, 336 (2003).

We agree with the District that the only conduct on the part of Detective Rauf that could constitute the kind of outrage contemplated by this tort was her role, indirect as it was, in the sequence of events which ultimately led to Mr. Tulin's arrest and prosecution. Mr. Tulin's claim for intentional infliction of emotional distress was based entirely on his theory that Detective Rauf falsely told the police that he had been driving recklessly, thus bringing about his arrest. Counsel for Mr. Tulin argued that Detective Rauf was liable for intentional infliction of emotional distress because she had "called the police and reported this as an officer in distress," and that she had then, by resort to what one might regard as a rhetorical question, effectively conveyed to Officer McKoy, a lower-ranking officer, that the incident called for an automatic lock-up.[17] Indeed, as the District argues in its brief, Detective Rauf's harsh words immediately after the accident were precisely the types of "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that this court has refused to find independently actionable.[18] *Jung v. Jung,* 791 A.2d 46, 50 (D.C.2002).

Furthermore, Detective Rauf's profane berating of Mr. Tulin immediately following the collision was not the cause of his emotional distress. Mr. Tulin testified that the distress which he suffered, including the aggravation of a pre-existing depression, resulted entirely from his arrest,

detention and criminal prosecution. If there had been no arrest or prosecution, then, as the District points out, the emotional injuries alleged by Mr. Tulin would not have occurred. Thus, Mr. Tulin's theory of intentional infliction of emotional distress—that Detective Rauf's words and actions caused him to be arrested, and subsequently prosecuted, without legal justification—is the only theory of intentional infliction of emotional distress which is supported by the evidence, or which was argued on behalf of Mr. Tulin.

There was, at the same time, ample evidence on the basis of which the jury could reasonably find that Detective Rauf intended to cause Mr. Tulin emotional distress and that she succeeded in doing so. Detective Rauf believed—or so she professed—that Mr. Tulin deliberately caused the accident, notwithstanding the value of his high-priced Porsche, in order to set up a lawsuit against her. There is no doubt that she was extremely angry. Her level of "pissitivity," as she testified, was high— enough so that she used foul and profane language in the presence, and possibly within the hearing, of her nine-year-old son. The jury could reasonably find that a person who was so enraged had ample motivation to inflict emotional distress. Consistently with such motivation, Detective Rauf, as she left the scene, asked Officer McKoy whether this was an "automatic lock-up," arguably implying the affirmative. Further, if the jurors credited Mr. Tulin's testimony, they could fairly find that he suffered severe emotional dis-

---

**17.** We also agree with the District that aside from Detective Rauf's comments in anticipation of Mr. Tulin's arrest, she engaged in no conduct amounting to intentional infliction of emotional distress.

**18.** Mr. Tulin testified that Detective Rauf said "you did that on purpose" in an agitated way,

and that she "continued to speak with her voice raised" after other police officers arrived. Detective Rauf testified, as we have noted, that when Mr. Tulin approached her after the accident, she "cursed" at him and told him to "get the hell out of [my] face."

tress (and plenty of it) in the hours, days and months that followed.

■ In any event, we agree with the District that the verdicts would have been consistent if the jury had found Detective Rauf liable for false arrest and malicious prosecution as well as for intentional infliction of emotional distress. That, however, is not the question. The Supreme Court of Texas effectively synopsized the appropriate approach as follows:

A court may not strike down jury answers on the ground of conflict if there is any reasonable basis upon which they may be reconciled.... We do not determine whether the findings may reasonably be viewed as conflicting; to the contrary, the question is whether there is any reasonably possible basis upon which they may be reconciled.

*Luna v. Southern Pacific Transp. Co.*, 724 S.W.2d 383, 384 (Tex.1987) (quoting *Bender v. Southern Pacific Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980)). Thus, "the determination that an inconsistency exists must be made only after a *concerted effort to reconcile every apparent inconsistency.*" *Miller v. Royal Netherlands S.S. Co.*, 508 F.2d 1103, 1106 (5th Cir.1975) (emphasis added).

We are satisfied that if the requisite "concerted effort" is made, then there simply is no irreconcilable inconsistency. The trial judge instructed the jury that "[a] false arrest is committed when one person intentionally and unlawfully arrests another." She added that "a person commits a false arrest when he or she intentionally detains or restrains another for any length of time ... without a warrant or other legal justification."

But Detective Rauf did not arrest or detain Mr. Tulin; Officer McKoy did. By the time of the arrest, Detective Rauf had driven away, presumably to drop off her son at school. No instruction was requested, or given, to the effect that one who counsels or encourages another to make a warrantless arrest is herself liable for false arrest. Although such an instruction, if it had been requested, might well have been appropriate, *see Smith v. District of Columbia*, 399 A.2d 213, 218 (D.C.1979), the jury cannot be faulted for construing the judge's instruction literally and clearing Detective Rauf of false arrest when the Detective did not arrest Mr. Tulin at all, whether lawfully or unlawfully.

With respect to the elements of malicious prosecution, the issue is arguably somewhat closer, but our conclusion is the same. The judge instructed the jury, without objection, that the plaintiff must show:

Number one, that the defendant began a criminal proceeding against the plaintiff; number two, that there was no probable cause for the criminal proceeding; number three, that the criminal proceeding terminated in favor of the plaintiff; and, four, that defendant acted with malice.

A person is responsible for beginning a criminal proceeding[19] if the person, (a), directs or requests a prosecution, based on information which the person knows is false, or, (b), withholds information which a reasonable person would realize might affect the decision to prosecute, or, (c), gives inaccurate or incomplete information to those who prosecute.

The jury may well have believed that Detective Rauf did not "begin" a prosecution of Mr. Tulin; indeed, there was no evidence that she did. Similarly, the jury could reasonably have questioned whether, on this record, the Detective "directed" or

---

19. As to whether a claim of malicious prosecution may also be based upon an unfounded civil suit, *see Joeckel v. Disabled Am. Veterans,* 793 A.2d 1279, 1282 (D.C.2002).

"requested" the prosecution of Mr. Tulin, or had anything to do with the decision to prosecute. Although the jury evidently believed that Detective Rauf provided false information about how the accident occurred—hence the verdict against her—the record is at best scanty as to whether she did so in order to affect the decision, subsequently made by a prosecutor rather than by a police officer, to bring a criminal charge of reckless driving against Mr. Tulin.[20]

Accordingly, we conclude that notwithstanding its verdict as to false arrest and malicious prosecution, the jury could legitimately find that the conduct in which Detective Rauf *did* engage constituted intentional infliction of emotional distress. No new trial is required if the jury follows the judge's instructions literally, without adopting the more sophisticated gloss that a trained lawyer might add to them. Although we are not privy to what occurred in the jury room, common sense suggests that the jury simply found that Detective Rauf, while furious at Mr. Tulin, was neither the arresting officer (she had left the scene by the time of the arrest) nor the person who prosecuted or decided to prosecute Mr. Tulin well after the accident.

It is apparent from the award of $450,000 against the District and Detective Rauf that the jurors believed the defendants to have caused Mr. Tulin serious harm. Their failure to recognize that someone other than the arresting officer could also be liable for false arrest, when the jurors were not instructed that this was so, or their determination that a police detective should not be held liable for an allegedly malicious prosecution brought by the Attorney General's office, did not render their verdict, or their fundamental "take" on the case, deficient or legally unacceptable.

### III.

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

20. Detective Rauf testified that she did not make the decision either to arrest or to prosecute Mr. Tulin. On moving, not at all implausibly, for a directed verdict, on the allegations of false arrest and malicious prosecution against Detective Rauf, counsel for the District stated that "there is no evidence in this case that [Detective Rauf] decided to arrest the plaintiff or that she decided to prosecute the plaintiff."